Thomas H. Geoghegan (*pro hac vice*)
tgeoghegan@dsgchicago.com
Michael P. Persoon (*pro hac vice*)
mpersoon@dsgchicago.com
Michael A. Schorsch (*pro hac vice*)
mschorsch@dsgchicago.com
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
Tel. (312) 372-2511
Fax. (312) 372-3791
admin@dsgchicago.com

Michael Kielsky
MK@UdallShumway.com
Udall Shumway
1138 North Alma School Rd, Suite 101
Mesa, Arizona 85201
Tel. (480) 461-5300
Bar No. 021864

*Attorneys for Plaintiffs.*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA
# PHOENIX DIVISION

| | |
|---|---|
| William Price Tedards, Jr.; Monica Wnuk; Barry Hess; Lawrence Lilien; and Ross Trumble, <br><br> Plaintiffs, <br><br> v. <br> Doug Ducey, Governor of Arizona, in his official capacity, and Jon Kyl, Senator of Arizona, in his official capacity, <br><br> Defendants. | No. 2:18-cv-4241-PHX-DJH <br><br> Hon. Diane J. Humetewa <br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION** <br><br> **ORAL ARGUMENT REQUESTED** |

**INTRODUCTION**

Without waiting 27 months, plaintiffs have a right to vote to fill the vacancy created by the death of Senator McCain. It is a *de facto* denial of a special election to put it off for *over* two years—longer than a Congressional term. Plaintiffs now seek an order to have an election at the earliest reasonably practicable date, likely no longer than a year from when the vacancy arose. Federal courts have held that the loss of elected representation for even *two months* is more than de minimis. In Arizona, in this past year, a vacancy in the U.S. House was filled by election in six months. The purpose of the Seventeenth Amendment was to put the right to direct elected representation in the Senate on a par with people's right to representation in the House. The loss of elected representation in the U.S. Senate is equally serious, and a Senator has an even greater vote in enacting the laws of the land. Nothing justifies Arizona in delaying an election for over two years.

In Count I, the plaintiffs challenge the Governor's deprivation of their *right to vote* for Senator for approximately twenty-seven months—far beyond the amount of time that is reasonably necessary to organize a special election to fill the McCain vacancy. Plaintiffs' right to vote on the late Senator McCain's replacement arises under the Seventeenth Amendment, the Privileges or Immunities Clause and the Equal Protection Clause of the Fourteenth Amendment, and the First Amendment.

In Count II, plaintiffs challenge *the imposition of an unelected Senator* on them for well over two years. To be sure, the use of a temporary appointee is permissible under the Seventeenth Amendment—but as a bridge to an election, and not a substitute for it.

1

Though closely related to plaintiffs' assertion of their right to vote, here plaintiffs press their distinct right to be represented in the national government by an *elected* Senator. This fundamental right—as well as the prohibition on state interference with it—arises under the Seventeenth Amendment, the Privileges or Immunities Clause of the Fourteenth Amendment, and the Elections Clause (U.S. Const. art. I, § 4).

In Count III, plaintiffs challenge the Arizona law that requires temporary appointees to the U.S. Senate to be of the same political party as the person vacating the office. A.R.S. § 16-222(c). By predetermining the party affiliation of any temporary appointee, Arizona both "injects itself into the election process," *Cook v. Gralike*, 531 U.S. 510 at 532 (2001) (Kennedy, J., concurring), and determines the viewpoints which plaintiffs and other citizens will hear and receive. *See Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,* 564 U.S. 721 (2011). This requirement violates the First Amendment rights of plaintiffs, exceeds the state's authority under the Elections Clause, and imposes an unconstitutional qualification for the office of Senator in violation of the Qualifications Clause (U.S. Const. art. I, § 3, cl. 3).

Defendants will argue that the Supreme Court—in a summary affirmance without opinion—approved a 29-month delay in a special election to fill a Senate vacancy in *Valenti v. Rockefeller,* 292 F. Supp. 851 (S.D.N.Y 1968), *summarily aff'd,* 393 U.S. 405 (1969). But the *Valenti* summary affirmance is inapposite for a host of reasons: the district court's holding was only that plaintiff voters had no right to an *immediate* special election five months after the vacancy arose; the district court did not consider the Elections Clause, Qualifications Clause, First Amendment, or Fourteenth Amendment;

and subsequent developments in Supreme Court jurisprudence call into question the grounds of decision. And so *Valenti* is no bar to the relief being sought here.

**FACTS**

The following facts are matters of public record of which this Court may take judicial notice. On August 25, 2018 Senator John McClain died after a long illness, and a vacancy in the State of Arizona's representation in the U.S. Senate arose. Arizona state law, specifically A.R.S. § 16-222, requires the Governor to make a temporary appointment until the people of the State fill the vacancy at the next general election. No provision is given for the special election of Senators, except at general elections. Until amendment of A.R.S. § 16-222 via an "emergency measure" on May 16, 2018the statute had provided if the vacancy in the Senate over six months to the next general election, then the people would fill the vacancy at that general election. Under the old law, had Senator McCain died before May 31, 2018, then an election to fill the vacancy would have been held on November 5, 2018. However, effective immediately on May 16, 2018, while Senator McCain was gravely ill, A.R.S. § 16-222 was amended to provide that if the vacancy arose within 150 days of the party primary elections in August, then the election to fill the vacancy would be put off until the general election in two more years.

When Senator McCain died on August 25, 2018, he still had four years to serve in his Senate term. On September 4, 2018, notwithstanding the lack of any state law authority for doing so, Governor Doug Ducey issued a proclamation or writ of election fixing the date of the special election to coincide with the general election in November 2020. On September 5, 2018, Governor Ducey also appointed Senator Jon Kyl to fill the

vacancy in the Senate on a "temporary" basis for the following 27 months. Jon Kyl is a Republican, and A.R.S. § 16-222 requires that the person appointed by the Governor be of the same political party as the former Senator whose death or resignation created the vacancy. Subsequently, Kyl submitted his resignation from the Senate effective December 31, 2018. On December 18, 2018, Governor Ducey appointed Martha McSally as the temporary appointee to serve from January 1, 2019 until the people fill the vacancy by election in November 2020. McSally, also a Republican as required by law, was defeated by Kyrsten Sinema in an election for U.S. Senator in November 2018.

The last time that a vacancy in the U.S. House arose in Arizona, the Governor issued a writ of election setting a date to fill the vacancy within six months. Representative Trent Franks submitted his resignation on December 7, 2017, and the people selected Debbie Lesko as his replacement in a special election held on April 24, 2018; Lesko assumed office on May 7, 2018.

**ARGUMENT**

**I. A 27-month delay of a special election to fill the McCain vacancy is a severe restriction on plaintiffs' right to vote with no compelling state justification, and is a *de facto* denial of plaintiffs' right to vote for an entire term of Congress.**

State laws that burden the right to vote are evaluated under a sliding scale framework. The Supreme Court has described the framework as follows:

> A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justification for the burden imposed by its rule, taking into

4

> consideration *the extent to which those interests make it necessary to burden the plaintiff's rights.*
>
> . . . [W]hen those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance.

*Burdick v. Takushi,* 504 U.S. 428 (1992) (internal citations omitted) (emphasis supplied). The Ninth Circuit, in applying this sliding scale framework, has held that "severe restrictions" on the right to vote are therefore subject to strict scrutiny—but even when it comes to "non-severe voting regulation," the state must make a stronger showing than is required under "ordinary rational basis review." *Soltysik v. Padilla*, 2018 U.S. App. LEXIS 33832, at *23-24 (9th Cir. Dec. 3, 2018).

As set out above, in this case the defendant Governor is enforcing the state-mandated *27-month delay* in holding an election. Denying plaintiff Arizona citizens the right to vote for a Senator for that long—a period longer than an entire Congressional term—surely qualifies as a "severe restriction" on the right to vote. And it is hard to see how it advances a state interest of *compelling* importance to delay an election for so long. It certainly is possible to organize a special election in less than 27 months: in the past ten years, the states of Alabama, New Jersey, and Massachusetts have all held special elections within several months of a Senate vacancy happening, and without waiting for the next general election. Arizona itself holds special elections for U.S. Representative within 6 months of the vacancy arising.

The defendants are likely to argue that the Seventeenth Amendment explicitly permits temporary appointments to the Senate, and allows special elections to occur "as

the legislature may direct," and that therefore the state legislature is free to delay the special election to fill Senator McCain's vacant seat for however long it wishes. But that argument is belied by the text and structure of the Seventeenth Amendment itself.

The second paragraph of the Seventeenth Amendment states as follows:

> When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided,* That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.

The primary clause—the requirement for the Governor to issue a writ—is modeled on the procedure for filling a vacancy in the House under U.S. Const. art. I, § 2. That provision states:

> When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.

The Framers had well-founded fears that state legislatures would not issue writs of election at all, or would otherwise compromise the national electoral process. *See Arizona v. Inter Tribal Council of Ariz., Inc.,* 570 U.S. 1, 8-9 (2013); *Rossito-Canty v. Cuomo,* 86 F. Supp. 3d 175, 180-81 (E.D.N.Y. 2015). As Alexander Hamilton wrote: "If the State legislatures were to be invested with an exclusive power of regulating these elections, every period of making them would be a delicate crisis in the national situation, which might issue in a dissolution of the Union, if the leaders of a few of the most important States should have entered into a previous conspiracy to prevent an election." *Federalist No. 59* (1788). The fact that the Seventeenth Amendment would, like Article I § 2, also

*mandate* a special election makes sense when one considers how the Amendment arose—from the 19th Century Progressive and Agrarian movements, which saw the Senate as a corrupt body that was not accountable to the people. *See generally* Kris W. Kobach, Note, *Rethinking Article V: Term Limits and the Seventeenth and Nineteenth Amendments*, 103 Yale L.J. 1971, 1976-77 (1994).

But precisely as Hamilton as well as the drafters of the Seventeenth Amendment feared, the State of Arizona has no particular commitment to maintaining the rights of its citizens to elected representation in the U.S. Senate. Indeed, in this case, concerned that the people might be able to replace the then-terminally ill Senator McCain *too quickly*, the Arizona legislature amended A.R.S. § 16-222 on May 16, 2018 to delay any special election for up to *thirty months*. *See* 2018 Ariz. HB 2538.

Thirty months—or 27 months—is just too long. It is unthinkable that if a vacancy arose in the U.S. House, the federal courts would permit a state legislature to put off a special election for anything remotely close to that. In *Jackson v. Ogilvie,* 426 F.2d 1333 (7th Cir. 1970), the Seventh Circuit held that the Governor of Illinois had a duty to issue a writ of election to fill a House vacancy, citing the strong interest in allowing citizens to take part in the political process. The Seventh Circuit quoted *Wesbery v. Sanders,* 376 U.S. 1, 17-18 (1964) as follows:

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

The Seventh Circuit held that the right to vote is "not limited to exercise at a biennial election, but is a continuing right which is not to be defeated by death of a Representative once chose, or other cause of vacancy." *Ogilvie*, 426 F.2d at 1336. Thus the court found that even if the election took place to fill a term of just a few months, losing even such a short period of elected representation would be than *de minimis*. *See also ACLU v. Taft,* 385 F.3d 641 (6th Cir. 2004) (Governor of Ohio violated his duty to call special election for vacant House seat although only six months were left in term).

There is no reason why the right to vote for one's representative in the Senate is any less precious than the right to vote for one's representative in the House. As set out above, the Seventeenth Amendment uses the same mandatory language as U.S. Const. art. I, § 2 in guaranteeing the people's right to vote in special elections: that the "executive authority . . . *shall* issue writs of election to fill such vacancies" (emphasis supplied). In other words, the temporary appointee is not intended as a substitute for the people's right to vote. Indeed the Seventh Circuit later relied on *Ogilvie* and required a special election to fill the *Senate* vacancy created by the election of Barack Obama to the presidency—even though only two months remained of President Obama's term in the Senate. *Judge v. Quinn*, 624 F.3d 352, 362 (7th Cir. 2010).

The people have a right to vote to fill vacancies under the Seventeenth Amendment. Arizona's 27-month delay on the exercise of that right is a "severe restriction" on the people's right to vote. Indeed it is worse than a restriction, as it amounts to a *de facto* denial of the people's right to vote for a period longer than an entire term of Congress. Hence the restriction can only be justified by "compelling" state

interests. No such interests exist. Accordingly this Court should order the Governor to issue a writ for a special election to be held as soon as is reasonably practicable, a period that plaintiffs submit is not likely to exceed one year from the date the vacancy arose. *Cf. Rhodes v. Snyder*, 302 F. Supp. 3d 905 (E.D. Mich. 2018) (reluctantly upholding an 11-month delay in holding a special election for U.S. Representative; but delay of two years would be "*de facto* refusal" to hold a special election at all); *Rossito-Canty v. Cuomo,* 86 F. Supp. 3d 175, 200 (E.D.N.Y. 2015) (state and federal law required a special election for U.S. Representative "as soon as practicable").

**II. The use of a temporary appointee for a 27 month period is an additional and separate injury to the plaintiffs' rights to direct elected representation and is beyond the authority of the state legislature.**

As just set out, the primary clause of the second paragraph of Seventeenth Amendment[1] ensures the right of the people to directly elect Senators in the case of a vacancy. In so doing it furthers "[t]he constitutional goal of assuring that the Members of Congress are chosen by the people." *Tashjian v. Republican Party*, 479 U.S. 208, 227 (1986). The proviso to the Seventeenth Amendment gives state legislatures the power to regulate these special elections: it allows for temporary appointments "until the people fill the vacancies by elections as the legislature may direct." While defendants may argue that the proviso turns the primary clause into a mere formality—giving state legislatures *carte blanche* to delay special elections as long as they wish, and to require the appointment of their political favorites in the meantime—it is not so.

---

[1] "When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies . . ."

Instead, the proviso to the Seventeenth Amendment only gives state legislatures a power over special elections that is coterminous with their power to make procedural rules under the Elections Clause, U.S. Const. art. I, § 4. *See Newberry v. United States*, 256 U.S. 232, 252 (1921) ("As finally submitted and adopted the [Seventeenth] Amendment does not undertake to modify Art. I, § 4 . . .") (Congressional power to regulate elections); *Judge v. Quinn*, 612 F.3d at 552-53 ("The phrase 'as the legislature may direct' affirms that the amendment was not intended to change the Elections Clause"); Vikram Amar, *Are Statutes Constraining Gubernatorial Power . . . Constitutional Under the Seventeenth Amendment?*, 35 Hastings Const. L.Q. 727, 730-32 (2008) (setting out the grammatical and historical reasons that "as the legislature may direct" refers to mere procedural regulations.).

The identity of the proviso with the Elections Clause is pivotal—for in the past two decades the Supreme Court has aggressively limited the scope of state authority under the Elections Clause. In *U.S. Term Limits v. Thornton,* 514 U.S. 779 (1995), the Court struck down an Arkansas law that imposed term limits on the state's Members of Congress. The Court struck down the law not only under the Qualifications Clause but as beyond the state legislature's authority under the Elections Clause:

> [T]he Framers understood the Elections Clause as a grant of authority to issue procedural regulations, and not as a source of power to dictate electoral outcomes, or to favor or disfavor a class of candidates, or to evade important constitutional restraints.

514 U.S. at 833-34. Likewise the Court has repeatedly affirmed limits on state legislative authority under the Elections Clause. *See Cook v. Gralike*, 531 U.S. 510 (2010) (striking

down Missouri law requiring information to be printed on ballots as to candidates for federal office favoring term limits); *Ariz. State Legisl. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652 (allowing people of Arizona by referendum to remove the power of state legislature to engage in redistricting). As Justice Kennedy wrote in concurrence in *Cook,* 531 U.S. at 527-28:

> A State is not permitted to interpose itself between the People and the National Government . . . . This dispositive principle is fundamental to the Constitution, to the idea of federalism, and to the theory of representative government.

Under this limited reading of state authority, the mandate here under A.R.S. § 16-222 that a temporary appointee serve for over two years in lieu of a Senator elected by the people is unlawful. It far exceeds the authority of a state legislature under the Elections Clause to issue "neutral" or "procedural" regulations only. *See Burdick,* 504 U.S. at 434; *see also U.S. Term Limits,* 514 U.S. at 834-35 (collecting cases). The extended term for a temporary appointee is not a "neutral" or "procedural" regulation but a substantive policy choice to prefer a political appointee instead of a Senator elected by the people. As a policy choice—against direct elected representation—A.R.S. § 16-222 far exceeds state authority under the Elections Clause. It impermissibly "dictates" an electoral outcome and impermissibly favors a class of candidates, namely temporary appointees like McSally, who are then able run to hold their seats with the huge political advantage of a two-year-plus incumbency.

Furthermore, A.R.S. § 16-222 is in clear conflict with the second paragraph of the Seventeenth Amendment, and beyond the authority of the state legislature as well. The

Seventeenth Amendment says that a state legislature may "empower" the Governor to make a temporary appointment. In conflict with this provision, A.R.S. § 16-222 does not "empower" but *mandates* that the Governor make such an appointment. *Cf.* V. Amar, 35 Hastings Const. L.Q. at 736 n.32 (no other "power" in the Constitution is mandatory). Allowing the state legislature to mandate a temporary appointee and do so for a particular term of office interferes with the duty of the Governor to act as a guardian of the people's right to vote and hold an election as soon as possible. Indeed, without state legislation removing the Governor's discretion, it would almost certainly politically impossible for the Governor by his own authority to keep in a temporary appointee for so long a period.

A law in excess of state legislative authority under the Elections Clause deprives plaintiffs of their right to vote under the Seventeenth Amendment. It also deprives plaintiffs of their rights as federal citizens under the Privileges or Immunities Clause of the Fourteenth Amendment. *See U.S. Term Limits,* 514 U.S. at 842-44 (Kennedy, J., concurring) (setting out how right to be free from state interference in federal elections is a privilege and immunity of national citizenship). As Justice Kennedy explains, plaintiffs have rights to the benefits of the Constitution's design, or at least to have a direct relationship with their representatives in Congress—representational and not just voting rights. "A distinctive character of the National Government, the mark of its legitimacy, is that it owes its existence to the act of the whole people who created it." *Id.* at 839. In that sense, an unelected appointee who holds office for 27 months—and who may or may not hold such office at the pleasure of the Governor—lacks the "legitimacy" that our Constitution requires of the national government.

Accordingly A.R.S. § 16-222 exceeds the state's authority under the Elections Clause and Seventeenth Amendment. By imposing a delay of up to 30 months on the people's right to vote (in this case 27 months), and by requiring the Governor to put in place a temporary appointee for such a long period, Arizona has crossed the line from issuing neutral, procedural regulations to dictating outcomes. And by imposing an unelected U.S. Senator on the plaintiffs—and all the people of Arizona—the state has abridged the privileges and immunities of their national citizenship.

### III. The provision of A.R.S. 16-222 that the temporary appointee in this case must be a member of the Republican party exceeds legislative authority under the Elections Clause and Qualifications Clause and violates the rights of plaintiffs under the First Amendment.

A.R.S. § 16-222(c) mandates that the Governor pick a temporary appointee who is a member of the same political party as the Senator who formerly held the now-vacant position. The late Senator McCain was, of course, a Republican. There are many open questions here—whether the appointee has to remain a Republican as a condition of office, or whether the temporary appointee serves at the pleasure of the Governor. What is clear is that the provision far exceeds the authority of the state legislature under the Elections Clause and Qualifications Clause. Furthermore, the provision interferes with the right of plaintiffs to be free of state *legislative* attempts to inject the State into "the debate over who should govern." *See Freedom Club PAC,* 564 U.S. at 750.

"[T]he Framers intended the Constitution to be the exclusive source of qualifications for Members of Congress, and that the Framers thereby 'divested' States of any power to add qualifications." *U.S. Term Limits*, 514 U.S. at 800-01. Nothing in the

Seventeenth Amendment undid or modified the Qualifications Clause; nothing about the Qualifications Clause suggests it applies only to elected Members of Congress. Hence, to the extent that A.R.S. § 16-222(c) imposes an additional substantive qualification on service in the Senate, it exceeds the state legislature's authority under the Elections Clause and flatly violates the Qualifications Clause. It is unconstitutional.

What is more A.R.S. § 16-222(c)'s requirement of party affiliation ensures that the Governor may not appoint a neutral caretaker but must appoint someone to disseminate a particular partisan point of view, with privileged access to speak to and for the people of the State. The Supreme Court has stated that such an attempt to control the message is exactly what the First Amendment prohibits the state from doing—and the concern is especially strong where temporary appointees regularly turn into candidates for office. *Cf. Freedom Club PAC*, 564 U.S. at 750; *Davis v. FEC*, 554 U.S. 724, 742 (2008) ("The argument that a candidate's speech may be restricted . . . has ominous implications because it would permit Congress to arrogate the voters' authority to evaluate the strengths of candidates competing for office"). While these cases involved money, it is even worse to mandate *by law* the particular partisan viewpoint that plaintiffs will hear and receive as constituents of the temporary appointee. Accordingly A.R.S. § 16-222(c) also violates the First Amendment.

**IV.     The decision in *Valenti v. Rockefeller* is no bar to relief.**

It is not true that the Supreme Court has upheld a 29-month delay in filling a Senate vacancy. *See Valenti v. Rockefeller,* 292 F. Supp. 851 (S.D.N.Y. 1968), *aff'd* 393 U.S. 405 (1969). In that case a divided three-judge court denied a claim that New York

14

voters had a constitutional right to a special election on a specific date—in November 1968, just five months after the vacancy arose. The district court framed its holding as follows (*id.* at 851):

> These three suits brought by New York voters sought a determination that the Seventeenth Amendment . . . requires that the Senate vacancy created by the death of Senator Robert F Kennedy on June 6, 1968 be filled at the November 1968 general election . . .

That was the specific relief sought: an election in November 1968, five months after Senator Kennedy was killed. The district court denied the demand for an election in November 1968, and the Supreme Court summarily affirmed. It is true that the district court adopted a broader view that a 29-month delay to the next general election in 1970 was permissible—but the actual judgment was to deny a claim that the election had to be held by November 1968. For the New York plaintiffs, it was 1968 or nothing.

Summarily affirming the judgment on that claim does not decide the issues here. In *Mandel v. Bradley,* 432 U.S. 173, 176 (1977) (per curiam), the Court repeated a frequent statement: "When we summarily affirm, without opinion . . . we affirm the judgment but not necessarily the reasoning by which it was reached." The Court has warned often against presuming that summary affirmance orders rest on the reasons articulated in lower court opinions. *E.g., Anderson v. Celebrezze*, 460 U.S. 780, 784 n.5 (1983) ("A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment."). As noted by the Seventh Circuit in *Judge v. Quinn*, the *Valenti* summary affirmance "leaves [lower courts] without firm guidance from the Supreme Court." 612 F.3d at 549.

In a case addressing appointments to Puerto Rico's legislature, *Rodriguez v. Popular Democratic Party,* 457 U.S. 1 (1982), the Court did paint its summary affirmance of *Valenti* with a broader brush. But the Court's remarks were true *obiter dicta*, an analogy made in passing—the case did not require the interpretation of the Seventeenth Amendment at all (Puerto Rico has no U.S. Senators). At any rate, the claim presented by plaintiffs here was never before the Supreme Court in *Valenti* because it was never presented to the district court. Instead the district court only held—and the Supreme Court only affirmed—that the Seventeenth Amendment did not require, of its own force, a special election within five months. *Valenti* did not address the Elections Clause, Qualifications Clause, First Amendment, or Fourteenth Amendment.

As this Circuit has noted, a summary affirmance is limited as binding precedent only as to the "precise issues" presented in those cases, and only "until doctrinal developments indicate otherwise." *Latta v. Otter,* 771 F.3d 456, 466-67 (9th Cir. 2014); *Wright v. Lane Cnty. Dist Ct.,* 647 F.2d 940, 941 (9th Cir 1981). As set out above, in the time since *Valenti* and *Rodriguez*, the Supreme Court has aggressively limited the scope of state authority under the Elections Clause. Even if there had been a broader reading adopted by the Supreme Court in *Valenti*—there was not— cases like *Thornton, Cook* and *Burdick* would call such a broader reading into question.

Accordingly neither *Valenti* nor *Rodriguez* is a bar to the relief sought by plaintiffs here: a special election within a reasonably practicable time, and an injunction against the continued imposition of political qualifications for office on U.S. Senators.

**V.  Plaintiffs Meet the Requirements for Injunctive Relief**

Plaintiffs meet the prerequisites for preliminary injunctive relief as set out in *Winter v. NRDC, Inc.*, 555 U.S 7, 20 (2011): "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that the injunction is in the public interest." Plaintiffs meet all four of these requirements. As set out in this brief, plaintiffs are likely to succeed on the merits of their claims that their constitutional rights are being violated. Furthermore, like other circuits, the Ninth Circuit has repeatedly held that "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Rodriguez v .Robbins,* 715 F.3d 1127,1144-45 (9th Cir. 2013); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017). The balance of equities also tips in plaintiffs' favor. This is not a case where plaintiffs seek to interfere with a fast-moving election, but rather to get in place some kind of election in an orderly manner—not significantly later than a year from the time of the vacancy. As to the public interest, notwithstanding the expense of a special election, the public has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006) (quoting *Dunn v. Blustein,* 405 U.S. at 336). Restoring the people's right to vote for a Senator who will be deciding the great national issues of our time is worth the incremental expense of a special election.

Dated: December 28, 2018  Respectfully submitted,

*/s/Thomas H. Geoghegan*
One of Plaintiffs' Attorneys