Michael T. Liburdi (#021894)
Daniel B. Seiden (#026728)
GREENBERG TRAURIG, LLP
2375 East Camelback Road, Suite 700
Phoenix, Arizona 85016
Telephone: 602.445.8000
Facsimile: 602.445.8100
E-mail: liburdim@gtlaw.com
         siedend@gtlaw.com

Brett W. Johnson (#021527)
Colin P. Ahler (#023879)
Andrew Sniegowski (#031664)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail: bwjohnson@swlaw.com
         cahler@swlaw.com
         asniegowski@swlaw.com

Anni L. Foster (#023643)
General Counsel
Office of Arizona Governor Douglas A. Ducey
1700 West Washington Street
Phoenix, Arizona 85007
Telephone: 602.542.4331
E-Mail: afoster@az.gov

*Attorneys for Defendant*
*Governor Douglas A. Ducey*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| William Price Tedards, Jr.; Monica Wnuk; Barry Hess; Lawrence Lilien; and Ross Trumble,<br><br>Plaintiff,<br><br>v.<br><br>Doug Ducey, Governor of Arizona, in his official capacity, and Jon Kyl, Senator of Arizona in his official capacity,<br><br>Defendant. | No. 2:18-cv-04241-DJH<br><br>**RESPONSE TO PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION AND PLAINTIFFS' MEMORANDUM OF LAW** |

Defendant, Douglas A. Ducey, Governor of the State of Arizona, hereby responds in opposition to Plaintiffs' Motion for Preliminary and Permanent Injunction ("Plaintiffs' Motion"). This Response is supported by the following Memorandum of Points and Authorities as well as Defendant's contemporaneously filed Motion to Dismiss.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs ask this Court to find a duly enacted Arizona statute concerning vacancy appointments to the United States Senate unconstitutional and to issue an injunction ordering the State of Arizona to conduct a special election. This is an extraordinary, unprecedented remedy that would impose substantial, irrevocable costs on the State and on Sen. Martha McSally (who has not been served with this action), and is not consistent with the Constitution, which expressly delegates to the state legislatures the authority to "empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct." U.S. CONST. amend. XVII; *accord* U.S. CONST. art. I, § 4, cl. 1.

## FACTS

Sen. John S. McCain III died only three days before Arizona's August 28, 2018 regular primary election date. Because this was less than 150 days before Arizona's primary election, Gov. Ducey temporarily appointed Sen. Jon Kyl, and subsequently Sen. Martha McSally to the vacant seat. Gov. Ducey also issued a writ of election proclaiming that the vacancy would be filled at the next general election in November 2020, as provided A.R.S. § 16-222, which specifies that if a vacancy occurs within 150 days of the primary election, the Governor shall make a temporary appointment who will serve until the second general election (i.e., not the general election that is only days away).

## ARGUMENT

**I.  Applicable Legal Standards.**

**A.  Mandatory injunctions are disfavored.**

A "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In an ordinary case, "[a]

plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

Plaintiffs' burden to obtain the requested mandatory injunction is even higher. *See Garcia v. Google, Inc.*, 786 F. 3d 733, 740 (9th Cir. 2015) (courts treat a preliminary injunction as a mandatory injunction when the remedy requested "orders a responsible party to take action.") (internal citation omitted). "[A] mandatory injunction goes well beyond simply maintaining the status quo" and "is particularly disfavored." *Id.* As such, mandatory injunctions are not appropriate in "doubtful cases" and should be denied "unless the facts and the law clearly favor the moving party." *Id.* (quoting *Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F. 3d 1150, 1160 (9th Cir. 2011) and *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)).

## B. A.R.S. § 16-222 is entitled to deferential constitutional scrutiny.

This case is subject to the deferential standard established in *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (refusing to apply strict scrutiny when state election law "imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters") (quotation marks omitted); *see also Soltsysik v. Padilla*, No. 16-55758, 2018 U.S. App. LEXIS 33832 (9th Cir. Dec. 3, 2018) ("We therefore decline to apply strict scrutiny."). Under the appropriate *Burdick* standard, "when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016) (en banc) (quotations omitted); *see also Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686, 702–703 (9th Cir. 2018); *Valenti v. Rockefeller*, 292 F. Supp. 851, 859-60 (W.D. N.Y. 1968) (affirming New York Senate vacancy law for furthering "substantial state interests"); *Trinsey v. Commonwealth of Pennsylvania*, 941 F. 2d 224, 234 (3d Cir. 1991) (applying "a more deferential standard of review" in a 17th

Amendment vacancy case).

## II. Plaintiffs Will Not Succeed on the Merits.

Considering Plaintiffs' high burden and the deferential standard of review, Plaintiffs' claims will not succeed on their merits. As discussed more fully in Defendant's Memorandum in Support of Motion to Dismiss, filed contemporaneously with this Response, the Constitution grants the Arizona Legislature broad discretion to establish its own procedures for filling Senate vacancies. *See generally* U.S. CONST. amend. XVII, para. 2; *Wash. State Grange v. Wash. State Republican Party*, 522 U.S. 442, 451 (2008). Arizona's vacancy statute is modeled off the vacancy statutes of eight other states and is broadly similar to several others. Its approach of authorizing the governor to appoint a Senator who will serve until the next general election has been repeatedly upheld by every court to consider the matter, including the United States Supreme Court, which summarily affirmed a decision upholding a New York law that resulted in a 29-month temporary Senate appointment in a factually similar case. *Valenti*, 292 F. Supp. 851, aff'd, 393 U.S. 405 (1969). "In [its affirmance of the district court decision in *Valenti v. Rockefeller*], the Court sustained the authority of the Governor of New York to fill a vacancy in the United States Senate by appointment pending the next regularly scheduled congressional election- in that case, a period of over 29 months." *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 10–11 (1982).

This rule was recently reaffirmed by the Seventh Circuit in *Judge v. Quinn*, 612 F.3d 537 (7th Cir. 2010). In *Judge v. Quinn*, the Seventh Circuit concluded that "the second paragraph of the Seventeenth Amendment establishes a rule for all circumstances: it imposes a duty on state executives to make sure that an election fills each vacancy; it obliges state legislatures to promulgate rules for vacancy elections; and it allows for temporary appointments until an election occurs." 612 F. 3d at 555; *see also Valenti*, 292 F. Supp. at 856 (reasoning that the "natural reading" of the 17th Amendment's proviso "grants to the states some reasonable degree of discretion concerning both the timing of vacancy elections and the procedures to be used in selecting candidates for such elections"). In evaluating

- 3 -

1 Illinois' vacancy provision, the court further reasoned that while the governor has a
2 mandatory duty to issue a writ of election, the legislature had given the governor only one
3 option, the date of the next general election. *Judge*, 612 F. 3d at 555. The 17th Amendment's
4 provision for temporary appointments indicates that "the drafters of the Seventeenth
5 Amendment intended to preserve, through the executive appointment power, the states'
6 ability to maintain their representation in the Senate until the group charged with selecting
7 a permanent replacement could exercise its constitutional role." *Judge*, 612 F.3d at 548.
8 Thus, the proviso to the 17th Amendment clearly delegates the timing of elections to the
9 state legislature.

10 Plaintiffs mischaracterize the Seventh Circuit's reasoning in *Judge* by stating that
11 "the Seventh Circuit later . . . required a special election to fill the *Senate* vacancy created
12 by the election of Barack Obama to the presidency – even though only two months remained
13 of President Obama's term in the Senate." [Doc. 15 at 8.] This is true, but misleading. The
14 court in *Judge* issued an injunction requiring the governor to issue a writ of election with a
15 specific date, but the date dictated by the court was the date required by Illinois statute –
16 the next scheduled general election. *Judge*, 612 F.3d at 555. The Seventh Circuit rejected
17 an argument by the plaintiffs in that case that the governor should be required or permitted
18 to issue a writ for an earlier election date. *Id.*[1]

19 Plaintiff's reliance on comparisons with vacancies in the House of Representatives
20 is also misplaced. [*See* Doc. 15 at 9.] House vacancies are governed by an entirely different
21 constitutional provision, Article I, Section 2 of the U.S. Constitution. Unlike the 17th
22 Amendment, which allows a state executive to temporarily fill a Senate vacancy, Article I,

---

[1] Plaintiffs cite *Tashjian v. Republican Party*, 479 U.S. 208, 227 (1986) for the argument that the primary clause of the second paragraph of the 17th Amendment ensures the right of the people to directly elect Senators in the case of a vacancy. In reality, the principle set forth in *Tashjian* is that "[t]he constitutional goal of assuring that the Members of Congress are chosen by the people can only be secured if that principle is applicable to every stage in the selection process." 479 U.S. at 227. This statement is inapplicable here, as the Court was referring specifically to the need for a primary election, and there is no debate that a primary election will be held in accordance with Arizona law as part of the process of selecting Sen. McCain's replacement.

Section 2 does not. Instead, it provides, "When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies." U.S. CONST. art. I, § 2. There is no provision for a temporary appointment to a House vacancy. The duration without a member in the House is designed to be short, as are the two-year terms of House members.[2] And seven states (Alaska, Delaware, Montana, North Dakota, South Dakota, Vermont, and Wyoming) have just one House member. When a vacancy occurs in those states, those people are left with no representation in the House. Plaintiffs also rely on the prompt special election to fill a recent vacancy in one of Arizona's U.S. House seats as support that there are not compelling interests to justify its alleged deprivation of the right to vote, but the Arizona Legislature reasonably determined that Senate vacancies should be treated differently than House vacancies in light of their different constitutional frameworks and availability of temporary appointment to fill vacancies in the Senate but not in the House. *See generally* A.R.S. § 16-222.

Moreover, as explained further in Gov. Ducey's Motion to Dismiss, § 16-222 advances several important public interests such as fiscal responsibility and efficient elections, increasing voter turnout and interest, and reducing the impact of special interest groups. Indeed, several states have an identical Senate vacancy process and at least one court has recognized similar state and public interests to those at issue here. *See Valenti*, 292 F. Supp. at 856 ("It is highly significant that most legislatures, as indicated by the

---

[2] Qualifications for the House are relatively few. Members of the House need only be at least 25 years old, have been a U.S. citizen for at least seven years, and live in the state they represent. *See* U.S. CONST. art. I, § 2, cl. 2; *see also* James Madison, The Federalist No. 52 (James Madison) ("Under these reasonable limitations, the door of this part of the federal government is open to merit of every description, whether native or adoptive, whether young or old, and without regard to poverty or wealth, or to any particular profession of religious faith."). In contrast, Senators must be at least 30 years old, have been a U.S. citizen for at least nine years, and live in the state they represent. U.S. CONST. art. I, § 3, cl. 3. In Federalist 62, James Madison explained, "The qualifications proposed for senators, as distinguished from those of representatives, consist in a more advanced age and a longer period of citizenship. . . .The propriety of these distinctions, is explained by the nature of the senatorial trust; which, requiring greater extent of information and stability of character, requires, at the same time, that the senator should have reached a period of life most likely to supply these advantages[.]" The Federalist No. 62 (James Madison). Moreover, Plaintiffs' citation to Federalist 52 is unpersuasive because it overlooks the fact that at that time, Senators were elected by state legislatures. [Doc. 15 at 6–7.]

Senatorial vacancy statutes of the 50 states, have interpreted the Seventeenth Amendment as granting to the states a discretion concerning the conduct of vacancy elections sufficiently broad to encompass the terms of New York Election Law 296.").

Section 16-222 designates the timing of special elections. Here, there is no dispute Gov. Ducey has issued a writ of election consistent with § 16-222. Because a special election has correctly been called in accordance with the Legislature's guidance, every element of the 17th Amendment has been fulfilled and Plaintiffs' right to vote has not been impacted. Section 16-222 is reasonable, non-discriminatory, and furthers Arizona's important regulatory interests. The statute is politically neutral and does not favor any party over another and does not deprive any citizen of the right to vote. In fact, § 16-222 benefits taxpayers and voters by avoiding the expense of an off-cycle election and allowing voters ample time to vet a potentially broader slate of candidates for a statewide office. Plaintiffs cannot meet their high burden of establishing that A.R.S. § 16-222 is unconstitutional.

### III. The Balance of Equities Favors Defendants.

Plaintiffs ask this Court to invalidate a duly enacted Arizona statute and order an expensive special election which will place a substantial burden on both the State of Arizona and its voters, who have just completed a contentious election cycle. Any injury to the Plaintiffs incurred by a minor delay in their opportunity to participate in the election of a replacement for Sen. McCain, by contrast, is minimal.

Plaintiffs mischaracterize the nature of the injury they allege as an injury to their "right to vote." [Doc. 15 at 7-9.] But, while "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction," "the right to vote, *per se*, is not a constitutionally protected right." *Rodriguez*, 457 U.S. at 9–10 (upholding the constitutionality of a vacancy appointment statute for the legislature of the Commonwealth of Puerto Rico). Plaintiffs do not allege a denial of an equal right to participate in elections, so there has been no deprivation of their constitutional right to vote.

Plaintiffs' arguments regarding the supposed injury associated with the "use of temporary appointee for a 27-month period" [Doc. 15 at 9] is nothing more than a reprise

of the same harm alleged in their first count: that the special election will be held in November, 2020. But the Elections Clause provides state legislatures the power to determine the procedural aspects of an election, including timing. U.S. CONST. art. 1, § 4, cl. 1. And, "[i]n contrast to requirements governing general elections, States are conferred greater discretion in choosing a procedure for filling vacancies." *See Gietzen v. McMillion*, 857 F. Supp. 777, 781 (D. Kan. 1994).

The State of Arizona, on the other hand, has three substantial state interests in holding a special election in 2020 that would be negatively impacted if a preliminary injunction was granted:

First, "the inconvenience and expense" of a special election "outweigh[s] any advantages to be derived from having a more prompt vacancy election." *Valenti*, 292 F. Supp. at 860, 863 (population and size differences between states provides "another logical explanation for the apparent intent of the drafters of the Seventeenth Amendment to place decisions concerning the conduct of vacancy elections largely in the hands of various state legislatures; what might be a perfectly feasible procedure in a small state such as Delaware might prove unworkable in a populous state like New York or a vast state like Alaska"); *cf. Rodriguez*, 457 U.S. at 12 ("[T]he interim appointment system plainly serves the legitimate purpose of ensuring that vacancies are filled promptly, without the necessity of the expense and inconvenience of a special election. The Constitution does not preclude this practical and widely accepted means of addressing an infrequent problem.").

Special elections are costly, diverting money and personnel from other public projects. Lee Miller, the immediate former Assistant Secretary of State who was responsible for the day-to-day management of Arizona's elections, has compiled the information on the costs associated with recent special elections. Declaration of Lee Miller, attached to this Response as Exhibit A. In May 2016, for example, Arizona held a state-wide special election in regard to Proposition 123, which cost the State $6,442,270.85. *Id*. at ¶¶ 3, 5. The last special election in Arizona, held to fill a House vacancy in the 8th Congressional District, cost Maricopa County nearly $2.7 million for the primary and general elections.

*Id*. at ¶ 6. A Senate special election would be statewide and require both a primary and a general election. Finally, these numbers only represent the public costs directly incurred by the State and counties, *id*. at ¶ 4, not the value of time contributed by poll volunteers and voters or the expense to the candidates and other politically active groups of conducting an off-year election.

Second, expedited elections favor special interest groups and candidates with considerable self-wealth or funding. *See Valenti*, 292 F. Supp. at 859 (it is "considerably more difficult for Senate candidates to finance a campaign in an off-year; they must carry most of the burden themselves"). An inability to raise sufficient funds would disadvantage candidates in Arizona. Section 16-222, however, creates a greater opportunity for a stronger pool of candidates to run in the vacancy election.

Third, requiring an off-cycle special election would harm Arizona because the special election, as shown by history, would likely yield a lower turnout. *Valenti*, 292 F. Supp. at 859 (holding a vacancy election with a regular election "is obviously a more desirable time to fill as important an office as United States Senator" because that is when "voter interest and turnout are at a maximum"). Setting an election in 2020 gives voters time to meaningfully vet the candidates and make an informed decision. *Cf. Anderson v. Celebrezze,* 460 U.S. 780, 796 (1983) ("There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election"). Moreover, the time before the vacancy election also reduces the risk of voter confusion. *See Bullock v. Carter,* 405 U.S. 134, 145 (1972) (states have an interest in "prevent[ing] the clogging of its election machinery, [and] avoid[ing] voter confusion").

**IV.   Public Interest Does Not Favor an Injunction.**

As discussed above, public interest would be harmed by the cost of an off-cycle election and the representational results of an off-cycle election. Regularly scheduled elections are more likely to capture the will of the people because voter turnout and interest is at its peak. *See Valenti*, 292 F. Supp. at 860, 863.

Plaintiffs ignore the multitude of other public interests at issue and simply argue that

"notwithstanding the expense of a special election, the public has a 'strong interest in exercising the fundamental political right to vote.'" [Doc. 15 at 17 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006))].[3] But just because the public has a "strong interest" in its right to vote does not mean that voters want to or benefit from being required to "vote early and often" rather than exercising their franchise at reasonable, scheduled intervals.

In addition, an adverse ruling in this case would also call into question at least eight other states' statutes that have nearly identical Senate vacancy provisions.[4] In addition, the 17th Amendment's delegation of timing of special elections to the states works to serve the diverse interests of the 50-states. Some states may be small enough to allow for a rapid special election, others, like Arizona, do not. *See Valenti*, 292 F. Supp. at 860 (reasoning that discretion was left to the states in the 17th Amendment "to allow the different states to take account of considerations [state interests] that the vacancy explicitly required that some period intervene between the creation of a vacancy and the holding of an election to fill it. The obvious purpose of these provisions was to allow time for the party nominees to be selected and for a campaign to be conducted by the nominees.").

Most importantly, the task of balancing the public interest in this situation was specifically entrusted by the Constitution to the Arizona Legislature. *See* U.S. CONST. art.

---

[3] Plaintiffs quote to *Purcell* is also taken out of context and misleading. *Id*. *Purcell* concerned the Voting Rights Act and a voter-identification requirement under Arizona law. *Purcell*, 549 U.S. at 2. The Court's note about the "fundamental political right" to vote comes from *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972), which discussed the right to vote in its proper context, the equal right to vote. *Id*. Plaintiffs' attempt to characterize these cases as establishing a right to vote in a special election at a time of their choosing thus is unsupported.

[4] Eight other states – Arkansas, Hawaii, Idaho, Minnesota, New Jersey, New York, South Carolina, and Virginia – take a nearly identical approach as Arizona. *See* Ark. Code § 7-8-102 (providing for vacancy to be filled at next following general election if vacancy occurs less than four months before next general election); Haw. Rev. Stat. § 17-1 (within 21 days of deadline for filing nomination papers); Idaho Code § 59-910 (30 days before general election); Minn. Stat. § 204D.28 (11 weeks before regular state primary), N.J. Stat. Ann. § 19:3-26 (30 days before general election), N.Y. Pub. Off. Law § 42(4-a) (59 days before primary election); S.C. Code § 7-19-20 (100 days prior to general election); Va. Code § 24.2-207 (120 days before general election).

I, § 4, cl. 1; U.S. CONST. amend. XVII. It is not the role of the Court to "balanc[e] . . . the respective interests in this situation." *Trinsey*, 941 F.2d at 235 (construing a vacancy statute). Instead, "[t]hat is a function for which the legislature is uniquely fitted[,] [and] [i]f the voters of the state are unhappy with the legislature's decision, then the democratic process gives them ample opportunity for redress." *Id.* None of the cases that construe the 17th Amendment have engaged in the type of line drawing and balancing advocated by Plaintiffs – debating how long is "too long." That is a decision that was squarely entrusted to the state legislatures, which are well within their competence to address it.

## V. Plaintiffs Suffered No Injury – Irreparable or Otherwise – from the Limitations Imposed by A.R.S. § 16-222 on the Governor's Appointments Power.

As more fully laid out in the Memorandum in Support of the Motion to Dismiss, Plaintiffs have no Article III standing to challenge A.R.S. § 16-222(C), which imposes a requirement that a temporary appointee be from the same political party as the former Senator. *See Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018). This provision places no restrictions on any right that is exercised by Plaintiffs as ordinary Arizona voters, and no facts have been alleged that suggest that it had any impact on Gov. Ducey's appointment decisions or that an order from this Court could provide any redress to Plaintiffs. If there is no injury to support standing, then there is certainly no irreparable injury to support a preliminary injunction.

Plaintiffs characterize this provision as a Senatorial qualification and non-procedural "state legislative attemp[t] to inject the State into 'the debate over who should govern.'" [Doc. 15 at 13 (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 750 (2011))]. However, the only cases Plaintiffs rely on to illustrate their point are campaign finance cases, *Freedom Club PAC*, 564 U.S. at 750 and *Davis v. FEC*, 554 U.S. 724, 742 (2008). These cases are inapplicable because they have nothing to do with the constitutionality of a state vacancy provision that mandates a party's replacement.

By contrast, the U.S. Supreme Court's reasoning in *Rodriguez* is again instructive. In *Rodriguez*, the plaintiffs challenged a Puerto Rico law that assigned the power to fill

vacant Puerto Rican legislative positions to the "political party with which the previous incumbent was affiliated." *Rodriguez*, 457 U.S. at 12. The Court upheld the provision, reasoning that the "Puerto Rico Legislature could reasonably conclude that appointment by the previous incumbent's political party would more fairly reflect the will of the voters than the appointment by the Governor or some other elected official." *Id.* The Court relied on the Supreme Court of Puerto Rico's conclusion that the "party appointment was a legitimate mechanism serving to protect the mandate of the preceding election and to preserve the 'legislative balance' until the next general election is held." *Id.* at 13.

The same reasoning is applicable here. It is reasonable for the Arizona Legislature to conclude that requiring the appointee to share the same political party as the previous Senator would "more fairly reflect the will of the voters" because it would provide legislative continuity to the position until the constitutionally responsible party, the people, could make their will heard again at a special election. Although Gov. Ducey and the late Sen. McCain shared the same party, this provision just as much protects against a gubernatorial overstep if the governor and Senator did not share the same party. Simply, the Plaintiffs are not harmed by requiring the same party affiliation between the prior Senator and the temporary appointee. The consistency is imperative to the maintenance and safety of the democracy.

## CONCLUSION

Plaintiffs have not met their burden in justifying a mandatory injunction. The facts and law overwhelmingly support Gov. Ducey's position. Every federal case considering Senatorial vacancies supports Gov. Ducey's appointment and constitutional reading of A.R.S. § 16-222. *See Valenti* at 861 ("We interpret and Seventeenth Amendment, as have most of the state legislatures, to allow the states to conduct Senate vacancy elections in accordance with their regular election procedures, so long as those procedures further substantial state interests."); *Judge*, 612 F. 3d 554 ("Whether the vacancy is first filled by a temporary appointee, as permitted by the proviso, is a matter left up to the state and is governed by state law. . . . State law controls the timing and other procedural aspects of

vacancy elections."); *see also Judge v. Quinn*, 624 F.3d 352 (7th Cir. 2010) (affirming the district court's permanent injunction to hold the special election discussed in *Judge* I); *Trinsey*, 941 F.2d at 234 (state not required to hold a primary election to fill vacant Senate seats). For these reasons and the reasons set forth in the Motion to Dismiss, Plaintiffs' Motion should be denied.

DATED this 11th day of January, 2019.

SNELL & WILMER L.L.P.

By: */s/ Brett W. Johnson*
Brett W. Johnson
Colin P. Ahler
Andrew M. Sniegowski
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

### CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of January, 2019, I electronically filed the foregoing Response To Plaintiffs' Renewed Motion For Preliminary Injunction And Permanent Injunction And Plaintiffs' Memorandum Of Law with the U.S. District Court Clerk's Office using the CM/ECF System for filing and transmittal of a notice of electronic filing to the CM/ECF registrants.

*/s/ Tracy Hobbs*