1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

8

9    William Price Tedards, Jr., et al.,        No. CV-18-04241-PHX-DJH

10                  Plaintiffs,                   **ORDER**

11   v.

12   Doug Ducey, et al.,

13                  Defendants.

14

15          This matter is before the Court on the following Motions: Plaintiffs' Motion for

16   Preliminary and Permanent Injunctions (Doc. 14); Plaintiffs' Motion to Consolidate Trial

17   on the Merits with a Hearing on the Motion for Preliminary and Permanent Injunctions

18   (Doc. 16); and Defendants' Motion to Dismiss the First Amended Complaint (Doc. 21).

19   The matters are fully briefed.[1]  The Court held oral argument on the Motion to Dismiss and

20   the Motions for Preliminary and Permanent Injunction on April 12, 2019, and took this

21   matter under advisement.  Plaintiffs subsequently filed a Motion for Status Conference.[2]

22   _____

     [1] Although the case was filed on November 28, 2018, a number of events caused the parties'
23   briefing to be delayed, namely Plaintiffs withdrew their initial motions and filed an
     amended complaint in late December 2018.  The parties then submitted a proposed
24   discovery and hearing schedule and the Court set oral argument on the Motions for the
     earliest available day considering all of the conflicts identified by the parties in their
25   proposed schedule.  (Doc. 42).

26   [2] Plaintiffs seek a status conference "to discuss the disposition of their renewed motion for
     a preliminary injunction." (Doc. 65 at 2).  The Court notes that Plaintiffs filed their Motion
27   less than two months after the Court took this matter under advisement.  Moreover,
     Plaintiffs acknowledge that "this case raised important issues and deserves the careful
     consideration of this Court." (*Id.*).  Although Plaintiffs' Counsel, Mr. Persoon, sought to
28   expedite the Court's ruling, the oral argument on the Motions was initially delayed due to
     his personal and/or business schedule, apparently having a number of conflicts from

(Doc. 65).  On June 20, 2019, Plaintiffs filed a Notice of Appeal.  (Doc. 68).  Plaintiffs do not appeal an Order of this Court, but contend they are appealing an "effective denial of Plaintiffs' Motion" for Preliminary and Permanent Injunction.  (*Id.*).[3]

Plaintiffs request the Court to declare unconstitutional an Arizona statute that establishes the procedures for appointment to the United States Senate when a vacancy in that office arises, arguing that the statute violates the Seventeenth Amendment to the Constitution.

## I.    Background[4]

United States Senator John S. McCain III died on August 25, 2018, leaving vacant an Arizona Senate seat he had held for over thirty years.  Senator McCain was re-elected to a six-year term on November 8, 2016, a term scheduled to end on January 3, 2023.  The next scheduled general election for that seat was to be held in November of 2022.  On September 4, 2018, Arizona Governor Doug Ducey appointed former Senator Jon Kyl to the vacant seat.  On September 5, 2018, Governor Ducey issued a writ of election pursuant to A.R.S. § 16-222 ("Section 16-222" or "the Statute") setting the dates of the special elections to fill the remainder of the term: a primary election to be held on August 25, 2020, and a general election to be held on November 3, 2020.  The individual elected in the 2020 general election will serve out the term's remaining two years.  Senator Kyl resigned his seat effective December 31, 2018, and Governor Ducey then appointed Representative Martha McSally, who presently occupies the seat.[5]

February through early April 2019.  (Doc. 42).  Moreover, as the Court noted in the Order setting the oral argument, "Defendants wish to expedite any hearing. Plaintiffs' counsel is apparently not available until April."  (Doc. 45).  Finding no reason to hold a status conference on this matter, the Motion will be denied.

[3] Plaintiffs attempted to side-step the jurisdiction of this Court by seeking an immediate ruling from the Ninth Circuit.  Because the Motion is still pending on this Court's docket, and there has been no Order of this Court appealed to the Ninth Circuit, the Court will issue its ruling on the Motions.

[4] At the hearing, the Court granted Defendants' request to take judicial notice of a number of publicly known facts that are not in dispute.  (Doc. 51).  Many of the facts in the background section herein come from generally known facts and public records.

[5] Defendant Senator Martha McSally appeared in this action and filed a Joinder to the Defendants' Motion to Dismiss.  (Doc. 62).

Plaintiffs are a group of registered Arizona voters, comprising an Independent, two Democrats, a Libertarian, and a Republican.  (Doc. 13 at 3).  Plaintiffs filed their original Complaint (Doc. 1) along with a Motion for a Preliminary Injunction or in the Alternative for a Permanent Injunction (Doc. 2) on November 28, 2018.  Those pleadings sought "an order directing the defendant Governor to issue a writ of election as required by the Seventeenth Amendment to fill the current vacancy in Arizona's representation in the Senate." (Doc. 1 at 2).  On December 12, 2018, Plaintiffs filed a Motion to Amend their Complaint, and also withdrew their initial Motion for Injunction.  (Doc. 11).  Plaintiffs then filed a renewed Motion for Preliminary and Permanent Injunction and a First Amended Complaint ("FAC"), alleging three claims: (1) 42 U.S.C. § 1983 ("Section 1983") deprivation of the right to vote under the Seventeenth Amendment; (2) Section 1983 violation of the Elections Clause and Seventeenth Amendment; and (3) Section 1983 violations of the Elections Clause, Qualifications Clause and the First Amendment.  (Doc. 13).  The FAC acknowledged that Governor Ducey had issued a writ of election on September 5, 2018, and that requested relief was removed from Plaintiffs' complaint. (Doc. 13).  Defendants seek dismissal of Plaintiffs' FAC, arguing that Plaintiffs have failed to state a claim on Counts One and Two of their FAC, and that they do not have standing to assert Count Three.  (Doc. 21).  For reasons that will become clear, the Court will first analyze Defendants' Motion to Dismiss.

## II.    Motion to Dismiss Legal Standards

Under Fed. R. Civ. P. 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*.  In other words, while courts do not require

"heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555.

Establishing the plausibility of a complaint's allegations is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Although a plaintiff's specific factual allegations may be consistent with a plaintiff's claim, a district court must assess whether there are other "more likely explanations" for a defendant's conduct such that a plaintiff's claims cross the line "from conceivable to plausible." *Id*. at 680-81 (quoting *Twombly*, 550 U.S. at 570). This standard represents a balance between Rule 8's roots in relatively liberal notice pleading and the need to prevent "a plaintiff with a largely groundless claim" from "'tak[ing] up the time of a number of other people, with the right to do so representing an *in terrorem* increment of settlement value.'" *Twombly*, 550 U.S. at 557–58 (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

Before proceeding to the analysis on the Motion to Dismiss and Motion for Preliminary and Permanent Injunction, the Court must consider other legal standards.

**III.    Seventeenth Amendment**[6]

The U.S. Constitution grants powers to the states to fill vacancies in the U.S. Senate that may occur as a result of death, resignation, or removal from office. The Seventeenth Amendment to the Constitution governs the procedure for filling vacancies that arise in the Senate. U.S. CONST. amend. XVII. The Amendment states, in relevant part:

> When vacancies happen in the representation of any state in the Senate, the executive authority of such state shall issue writs of election to fill such vacancies: Provided, that the legislature of any state may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.

U.S. CONST. amend. XVII.

---

[6] Some of the historical background on appointments to the United States Senate is taken from publicly accessible information from the Senate Historical Office. https://www.senate.gov/artandhistory/history/common/briefing/senators_appointed.htm

Unlike the procedure for filling vacancies in the U.S. House of Representatives, which can be filled only by special election, the Seventeenth Amendment gives the state legislatures the authority to establish procedures for filling vacancies in the Senate. U.S. CONST. amend. XVII. If a vacancy occurs for any reason, such as a senator's death, resignation, or expulsion, the Seventeenth Amendment permits state legislatures to empower the governor to appoint a replacement until a special election can take place. *Id.* Since ratification of the Seventeenth Amendment in 1913, all fifty states have enacted legislation on the matter.[7] The majority of the states allow the governor to make a temporary appointment pending a special election.[8]

Article I, Section 4, often referred to as the Elections Clause, grants the individual states the power to determine the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to conflicting federal law. U.S. CONST. art. I, § 4; *see also Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 451 (2008) ("The States possess a broad power to prescribe the Times, Places, and Manner of holding Elections for Senators and Representatives."). Based on the authority granted to it by the Seventeenth Amendment, in conjunction with the Elections Clause, the Arizona Legislature passed a statute outlining the procedures for filling vacancies in the U.S.

---

[7] During oral argument, Plaintiffs argued that the Court should not consider other states' relevant legislation in assessing the constitutionality of the Statute, because "to the extent that a lot of other states have something similar . . . that's not right at all." (Doc. 61 at 47). Plaintiffs nonetheless urge the Court to compare the statutes passed in Alabama, New Jersey, and Massachusetts because they "all held special elections within several months of a Senate vacancy happening." (Doc. 15 at 6). Plaintiffs' arguments here are inconsistent and self-serving.

[8] As of 2018, 36 states require a special election to be held at the next scheduled general election, with some of those states having an exception that if the vacancy arose within a certain number of days of the general election, the election is held at the subsequent election. *Filling Vacancies in the Office of United States Senator,* (December 2007) http://www.ncsl.org/research/elections-and-campaigns/vacancies-in-the-united-states-senate.aspx. All of these states allow their governor to make a temporary appointment to serve until an election is held. The remaining 14 states require that a special election be called within a certain number of days of the vacancy, without regard to the date of the next regularly scheduled general election. Nine of those states allow the governor to make a temporary appointment. *Id.* A number of states require the replacement to be of the same political party as the previous incumbent. Only four states expressly prohibit the governor from making a temporary appointment to the vacant Senate seat, resulting in a lapse of representation until a special election can be held. *Id.*

Senate.  Section 16-222(c) states:

> For a vacancy in the office of United States senator, the governor shall appoint a person to fill the vacancy. That appointee shall be of the same political party as the person vacating the office and, except as provided in subsection D of this section, shall serve until the person elected at the next general election is qualified and assumes office.

Section 16-222(d) states that:

> If a vacancy in the office of United States senator occurs more than one hundred fifty days before the next regular primary election date, the person who is appointed pursuant to subsection C of this section shall continue to serve until the vacancy is filled at the next general election.

> If a vacancy in the office of United States senator occurs one hundred fifty days or less before the next regular primary election date, the person who is appointed shall serve until the vacancy is filled at the second regular general election held after the vacancy occurs, and the person elected shall fill the remaining unexpired term of the vacated office.

A.R.S. § 16-222(d).

Senator McCain died on August 25, 2018, three days prior to the primary election scheduled for August 28, 2018.  Therefore, the initial vacancy occurred "one hundred fifty days or less before the next regular primary election date."  Pursuant to Section 16-222, Governor Ducey appointed former Senator Jon Kyl to fill the vacant seat and issued a writ of election for the vacancy, to occur at the next general election on November 3, 2020. Senator Kyl resigned the seat effective December 31, 2018, creating another vacancy. Governor Ducey appointed Martha McSally to fill that vacancy, and pursuant to the Statute, she "shall continue to serve until the vacancy is filled at the next general election."[9]

…

…

---

[9] This time, the vacancy arises out of the first portion of Section 16-222(d), because the vacancy was more than "one hundred fifty days before the next regular primary election date."  The parties did not argue the distinction between the Sen. McCain vacancy and the Sen. Kyl vacancy.  However, it appears that it is a distinction without a difference, as the date of the vacancy election pursuant to Section 16-222 would have been in November 2020 regardless of the resignation of Sen. Kyl.

**IV.   Analysis**

Plaintiffs' renewed Motion for Preliminary and Permanent Injunction[10] asks this Court to order the "Governor of Arizona to issue a writ of election that will call a special election, at the earliest reasonably practicable date but not longer than one year," from the date of Sen. McCain's death.  (Doc. 14 at 2).  Plaintiffs' FAC contains three counts alleging: (1) Section 1983 deprivation of the right to vote under the Seventeenth Amendment; (2) Section 1983 violation of the Elections Clause and Seventeenth Amendment; and (3) Section 1983 violations of the Elections Clause, Qualifications Clause and the First Amendment.  (Doc. 13).  Plaintiffs also seek the Court to "retain continuing jurisdiction of this case for other relief that may be appropriate to ensure a special election consistent with the rights of plaintiffs as declared above."  (*Id.*).  For their requested injunctive relief, Plaintiffs request the Court to order the Governor to "issue a writ of election that will call a special election, at the earliest reasonably practicable date but in not longer than one year."  (Doc. 14 at 2) (sic).  Plaintiffs' memorandum of law in support of their Motion for injunctive relief largely mirrors the relief sought in the FAC.

At the hearing, the Court asked Plaintiffs what specific relief they were seeking. Counsel for Plaintiffs stated that they were asking for the Court to declare: (1) that the 27-month appointment is unconstitutional as it exceeds a "temporary" appointment pursuant to the Seventeenth Amendment and that, "by waiting more than one congressional term to fill the vacancy by election," the Statute violates the Constitution; (2) that Section 16-222's requirement that the executive "shall" appoint someone to a vacancy be declared unconstitutional so that the executive would have the option to hold a special election immediately; and (3) that the "same political party" requirement in Section 16-222 is unconstitutional.  (Doc. 61).

…

…

---

[10] Plaintiffs' first pleadings asked the Court to Order the Governor to "issue a writ of election."  (Doc. 1).  However, these initial motions were withdrawn and amended, presumably due to Plaintiffs' realization that Governor Ducey had already issued a writ of election for November 3, 2020.

1    **A.      Standard of Review**

2          As an initial matter, the Court must determine what standard of review to apply to

3    the Constitutional issues raised in this case.  Plaintiffs argue that, in application, Section

4    16-222 imposes a severe restriction on their right to vote, and thus strict scrutiny applies to

5    the Defendants' justifications for "delaying" the special election.  Defendants argue that

6    the Statute imposes reasonable and nondiscriminatory restrictions on the Plaintiffs' First

7    and Fourteenth Amendment rights to vote and thus they are not required to show the Statute

8    is narrowly tailored to advance a compelling state interest.  (Doc. 21 at 4-5).

9                **1.      Legal Standards**

10          Individuals have a protected right to vote under the First and Fourteenth

11    Amendments to the Constitution.  Indeed, "voting is of the most fundamental significance

12    under our constitutional structure." *Illinois Bd. of Elections v. Socialist Workers Party*,

13    440 U.S. 173, 184 (1979).  "These associational rights, however, are not absolute and are

14    necessarily subject to qualification if elections are to be run fairly and effectively." *Munro*

15    *v. Socialist Workers Party*, 479 U.S. 189, 193 (1986).  As to the right to vote, the Supreme

16    Court has noted that the Constitution "does not confer the right of suffrage upon any one,"

17    *Minor v. Happersett*, 88 U.S. 162, 178 (1874), and that "the right to vote, *per se*, is not a

18    constitutionally protected right." *San Antonio Independent School Dist. v. Rodriguez*, 411

19    U.S. 1, 35, n.78 (1973).  For instance, states retain "broad power to prescribe the Times,

20    Places and Manner of holding Elections for Senators and Representatives." *Tashjian v.*

21    *Republican Party of Conn.*, 479 U.S. 208, 217 (1986) (internal citation omitted).  However,

22    a state's broad "power is not absolute." *Wash. State Grange*, 552 U.S. at 451.

23          Therefore, there must be a balance between the right of the state to manage its

24    elections and the right of the individual to vote. *Id.*  The standard of review for laws

25    regulating a person's First and Fourteenth Amendment rights to vote was analyzed by the

26    Supreme Court in *Burdick v. Takushi*, 504 U.S. 428 (1992).  There, the Supreme Court

27    held that states "must play an active role in structuring elections," and that "[e]lection laws

28    will invariably impose some burden upon individual voters." *Id.* at 433.  "Consequently,

not every voting regulation is subject to strict scrutiny." *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016). Rather, "a more flexible standard applies." *Id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). "A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* Courts "have repeatedly upheld as 'not severe' restrictions that are generally applicable, evenhanded, politically neutral, and protect the reliability and integrity of the election process." *Id.* (quoting *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011)). "[T]o subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433.

Therefore, while strict scrutiny is applied when a state imposes severe restrictions on the right to vote, where "a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Pub. Integrity* 836 F.3d at 1024 (quoting *Anderson*, 460 U.S. at 788).

## 2. Analysis

To determine what standard of review to apply, the Court must consider the claimed voting restrictions imposed on Plaintiffs, balanced against Defendants' proffered interests in regulating its elections. Plaintiffs argue that Section 16-222, as applied here, severely burdens their First and Fourteenth Amendment rights to vote by denying them an oppourtunity to vote for over 27 months. Plaintiffs argue that any period of time longer than one year is "obviously severe." (Doc. 35 at 11). Further, they argue, without citing to any authority, that "any delay longer than a year is *presumptively suspect* absent a

showing it is necessary to serve some compelling state interest," and that they have a right to "direct elected" representation in the Senate "except for *reasonable and brief interim periods*." (Doc. 13 at 2 and 6) (emphasis added).  Defendants make a number of arguments as to why Section 16-222's restrictions are reasonable and necessary to protect Arizona's election process, including: maximizing voter turnout; the high cost of holding special elections; avoidance of confusion and inconvenience to voters; and standardization of election dates.  (Doc. 21 at 11-14).  These State interests will be analyzed in turn.

### a.      Maximizing voter turnout

One state interest advanced by Defendants is maximizing voter turnout.  Plaintiffs' Counsel recognized voter turnout as being "somewhat important" to the State.  (Doc. 61 at 16).  Defendants produced exhibits evidencing that the number of votes cast in special elections is dramatically less than the number of votes cast in general elections.  (Doc. 51-1).  For example, for a state-wide special election held on May 17, 2016, only 1,064,649 votes were cast out of 3,353,289 registered voters in the state, for a total of 31% turnout.  (*Id.*).  In the State's most recent special election on April 24, 2018, for a vacancy in the House of Representatives, 184,201 votes out of a possible 455,660 were cast, for a turnout rate of 40%.  (*Id.* at 30).  Conversely, 2,661,497 votes were cast out of 3,588,466 registered voters in the November 2016 general election, for a total of 74% voter turnout.  (*Id.* at 6).  The State has an interest in having high turnout for Senate elections.  *Valenti v. Rockefeller*, 292 F. Supp. 851, 854 (W.D.N.Y. 1968), *aff'd* 393 U.S. 405 (1969).  (finding a "substantial state interest" in delaying an election until the scheduled general election, where "voter interest and turnout are at a maximum").  Moreover, Section 16-222 does not restrict access to the election process, nor does it discriminate against classes of voters.  While Plaintiffs argue the reasons cited by Defendants are not legitimate reasons, it is apparent that Defendants seek to *increase* rather than suppress the right to vote, as evidenced by the above data which shows drastically reduced voting rates at recent special elections as opposed to general elections.  The Court finds voter turnout to be an important State interest.

b.      **Cost of special election**

Next, Defendants argue that statewide special elections are expensive, and that holding an election by August 2019, as Plaintiffs desire, would cause a significant financial burden on the State.  Plaintiffs acknowledge that the cost of the special election would be borne by the people of Arizona.  (Doc. 15 at 18).  Defendants explain that, under Plaintiffs' proposed deadlines, not only would there need to be an additional special election, but an additional primary election as well.  Defendants produced exhibits showing that the May 2016 special election, which concerned a ballot proposition and did not require a primary election, cost the State approximately $6.5 million.  (Doc. 22-1).  The 2018 House vacancy special election for the 8th Congressional District, encompassing only Maricopa County, cost tax payers approximately $2.7 million.  (*Id.*).

Conversely, there would be no additional cost to the State to hold the vacancy election at the next general election in November 2020, as that election is already scheduled to take place.  *See Valenti*, 292 F.Supp. at 860 (finding that "the inconvenience *and expense to the state* . . . outweighed any advantages derived from having a more prompt vacancy election") (emphasis added).  The Court finds the protection of tax-payer resources to be an important regulatory interest to Defendants.

c.      **Confusion and inconvenience to voters**

Defendants also argue that special elections have the potential to confuse and inconvenience voters who have to quickly familiarize themselves with numerous candidates for a primary election and subsequent special election.  This issue can create barriers to ballot access.  *See Lynch v. Illinois State Bd. of Elections*, 682 F.2d 93, 97 (7th Cir. 1982) ("Standardization of election dates helps eliminate surprise and confusion among potential candidates and thereby lowers some of the inherent barriers to effective ballot access.  It also imposes a reasonable limit on the number of times voters may be called to the polls and creates an opportunity for more widespread voter attention by establishing election dates which are convenient and on which the electorate will consider other important issues and fill other offices.").  Other inconveniences to all Arizona citizens

include the potential for months of highly politicized advertising leading up to the special elections, which would otherwise not occur at this time, and not allowing adequate time for voters to make an informed voting decision.  Here, a unified election date has the potential to lower the barriers to ballot access, allowing more Arizona voters the chance to exercise their right to vote.  *See Anderson*, 460 U.S. at 796 ("There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election.").  The Court finds the State's interest in having the special election date align with the next general election to be an important regulatory interest.

Therefore, Section 16-222 serves important state interests, applies to all voters equally, is evenhanded and politically neutral, and protects the integrity and reliability of the election process as described above.  The Statute does not deprive any Arizona citizen of their right to vote.  In fact, the citizens of Arizona will get to exercise their right to vote two years earlier than they would have had the right to do otherwise.  That is, an election for this seat was held in 2016 and the next election was to occur in 2022, but will now occur in 2020.  Additionally, the Supreme Court has recognized the right to regulate elections in this way.  *See Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 12 (1982) ("Moreover, the interim appointment system plainly serves the legitimate purpose of ensuring that vacancies are filled promptly, without the necessity of the expense and inconvenience of a special election. The Constitution does not preclude this practical and widely accepted means of addressing an infrequent problem.").  Given that Section 16-222 "does not restrict access to the electoral process or discriminate among classes of voters or political parties, the method chosen by the state legislature for filling vacancies is entitled to substantial deference."  *See Lynch*, 682 F.2d at 96.

There is simply no delay of Plaintiffs' right to vote.  The Seventeenth Amendment does not mandate that a special election take place within a certain time frame.  Rather, it allows the election to be held "as the legislature may direct."  U.S. CONST. amend. XVII.  Here, Section 16-222 imposes reasonable and nondiscriminatory restrictions on the

Plaintiffs' First and Fourteenth Amendment rights to vote, and the regulatory interests of the State are sufficient to justify the limited restrictions. *See Burdick*, 504 U.S. at 433. Therefore, and for reasons more fully explained below, strict scrutiny will not be applied.[11]

### B. 27-Month Delay

Plaintiffs next argue that the portions of Section 16-222 that direct the governor to appoint a person to fill a vacancy for more than a year, which in this case amounts to a period of 27 months, are unconstitutional under the Seventeenth Amendment and result in an infringement on their First and the Fourteenth Amendment rights to vote. Plaintiffs argue that they "have a right to fill the vacancy by election of the people at a date no later than a year from which the vacancy arose, absent a finding that a delay of more than a year is necessary for a compelling state purpose." (Doc. 13 at 9). Defendants argue Section 16-222 is constitutional in all respects.

### 1. Legal Standards

As analyzed by other courts, the portion of the Seventeenth Amendment addressing Senate vacancies has two sections, the "principal clause," and the "proviso." *See Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010). The principal clause states that, "When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies." U.S. CONST. amend. XVII. As the court stated in *Judge*, "if the Seventeenth Amendment ended with the principal clause, our task would be over." *See Judge*, 612 F.3d at 547. Of course, it does not. The proviso, which comes directly after the principal clause, permits the legislature to establish a procedure for the executive to make temporary appointments to fill vacancies. The proviso states "[t]hat the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct." U.S. Const. amend. XVII.

"[T]he Seventeenth Amendment permits a state, if it chooses, to forgo a special

---

[11] Plaintiffs' Counsel acknowledged that if the Court finds that the delay of the election imposed by Section 16-222 is a permissible and reasonable means of restricting the right to vote, "then there would be no meaningful infringement. There would be no violation of a legal right." (Doc. 61 at 20).

election in favor of a temporary appointment to the United States Senate[.]"  *Rodriguez*, 457 U.S. at 11.  Most challenges to this Amendment involve the meaning of the word "temporary."   A 29-month vacancy appointment was upheld by the Supreme Court in *Valenti*.  The circumstances in *Valenti* are similar to the facts of this case.  The vacancy in that case arose as a result of the assassination of Senator Robert Kennedy in 1968.  There, the governor made a vacancy appointment pursuant to a New York statute which would continue for 29 months.  A three-judge panel of the district court held that the New York appointment statute was constitutional.  *Id.*   The Supreme Court not only summarily affirmed *Valenti*, but has also discussed its holding with approval in subsequent rulings. *See Hicks v. Miranda*, 422 U.S. 332, 344 (1975); *see also Rodriguez*, 457 U.S. at 10-11 ("In [its affirmance of the district court decision in] *Valenti v. Rockefeller,* the Court sustained the authority of the Governor of New York to fill a vacancy in the United States Senate by appointment pending the next regularly scheduled congressional election-in that case, a period of over 29 months.").   *Valenti* thus "interpret[ed] the Seventeenth Amendment, as have most of the state legislatures, to allow the states to conduct Senate vacancy elections in accordance with their regular election procedures, so long as those procedures further substantial state interests."  *Valenti*, 292 F.Supp. at 861.

Moreover, the Supreme Court has held that the state possesses "substantial state interests" to set a special election to coincide with the next general election, including "voter interest and turnout," the "inconvenience and expense" associated with special elections, and "allow[ing] time for the party nominees to be selected and for a campaign to be conducted by the nominees."  *Id.* at 859-60; *see also See Lynch*, 682 F.2d at 97. "[T]he interim appointment system plainly serves the legitimate purpose of ensuring that vacancies are filled promptly, without the necessity of the expense and inconvenience of a special election.  The Constitution does not preclude this practical and widely accepted means of addressing an infrequent problem."  *Rodriguez*, 457 U.S. at 12.

### 2.    Analysis

Plaintiffs first argue that, because "the vacancy created by the death of Senator

McClain [sic] will not be filled by election of the people for a period of about twenty-seven months," the Arizona statute allows an appointment that, at some point, becomes longer than "temporary."  (Doc. 13 at 4).  They argue that by "delaying" the election for 27 months,[12] the "Governor has effectively denied the right to a special election required by the Seventeenth Amendment."  (Doc. 13 at 2).  Plaintiffs concede, however, that "a temporary appointment is permissible" pursuant to the Seventeenth Amendment.  (Doc. 15 at 2).

Nothing in the Seventeenth Amendment, or in relevant case law, supports Plaintiffs' arguments.  Other courts, albeit few in number, have addressed this issue.  "A 'natural reading' of the vacancy provisions of the Seventeenth Amendment 'grants to the states some reasonable degree of discretion concerning both the timing of vacancy elections and the procedures to be used in selecting candidates for such elections.'" *Gietzen v. McMillon*, 857 F. Supp. 777, 782 (D. Kan. 1994) (quoting *Valenti*, 292 F. Supp. at 856).  "[T]he explicit provision in the vacancy paragraph of the Seventeenth Amendment vesting discretion in the state legislatures not once, but twice, cannot have been without significance."  *Trinsey v. Pennsylvania*, 941 F.2d 224, 234 (3d Cir. 1991). Perhaps most significantly, the Supreme Court cited with approval the *Valenti* decision upholding a governor's appointment to a Senate seat where the appointment lasted 29 months.  *See Rodriguez*, 457 U.S. at 10–11 (1982); *see also Judge*, 623 F. Supp. at 933, 940 (N.D. Ill. 2009), aff'd, 612 F.3d 537 (7th Cir. 2010) (noting that "nearly two years will pass before the vacancy is filled by election . . . it is still well within the period that *Valenti* allowed.").  Other cases cited by Plaintiffs regarding state special elections are not persuasive to this Court.[13]

---

[12] While Plaintiffs consistently refer to a "delay" of the election, there has been no delay. The election is scheduled to be held on November 3, 2020, pursuant to Section 16-222, and there is no evidence that the election has been or will be delayed from that date.

[13] Plaintiffs cite a number of cases in which special elections were held for House vacancies mere months from the date the vacancy arose.  These cases are inapposite for a number of reasons.  As an initial matter, a House term is only two years, so a House vacancy would never last as long as the vacancy here.   Most importantly, however, temporary appointments are explicitly not allowed for House vacancies.  "The House vacancy provision begins and ends with the imposition of a mandatory duty to call an election for

1    Plaintiffs make a number of inconsistent arguments as to their interpretation of the

2    Seventeenth Amendment as it relates to the timing of a special election.  Initially they

3    argued that the Seventeenth Amendment requires the Governor to hold an election "as soon

4    as is *reasonably practicable*."  (Doc. 15 at 10) (emphasis added in all following).  At the

5    hearing, Plaintiffs' Counsel stated that "refusal to hold a special election for *more than an*

6    *entire congressional term* is prohibited by the Constitution."  (Doc. 61 at 5).  In their

7    briefing on their injunction request, Plaintiffs request an election be held "*not significantly*

8    *later than a year* from the time of the vacancy."  (Doc. 15 at 18).  Later, Plaintiffs changed

9    their argument slightly, arguing at the hearing that the election must be held "*within one*

10    *year* of the vacancy."  (Doc. 61).  Counsel for Plaintiffs further altered this argument by

11    agreeing that a "one-year rule" would not be a bright line rule and the date would be up for

12    negotiation.[14]  (*Id.*).  When pressed by the Court as to what would be a complying time

13    period, Plaintiffs' counsel stated that this Court should "tell Governor Ducey, 'I'm not

14    going to tell you what date you have to have [the election] done by.  I'm going to give you

15    a chance to come forward with a date.  And if you drag your feet and mess around, I will

16    regretably order you to do it.'"  (Doc. 61 at 13).

17    Complying with the Seventeenth Amendment and the Elections Clause, the Arizona

18    legislature empowered the governor to issue a writ of election and make a temporary

19    appointment.  *See* U.S. CONST. amend. XVII; *see also* Art. I, § 4.  As to the duration of the

20    vacancy, neither party presented authority finding a state statute unconstitutional for

21    allowing appointments that were longer than "temporary."  Further, none of the cases cited

22    by the parties, other than cases related to House vacancies, come anywhere close to

23

24    the vacancy."  *Judge*, 612 F.3d at 547; *see also* U.S. CONST. Art. I, § 2, cl. 4 ("When
      vacancies happen in the Representation from any State, the Executive Authority thereof

25    shall issue Writs of Election to fill such Vacancies.").

26    [14] At one point, Plaintiffs' Counsel suggested that the Court ask Defendants to come up
      with a reasonable proposed date for holding an election sooner than November 3, 2020,

27    and only order the Governor to issue a specific date for holding the election if the Plaintiffs
      were not satisfied with the date proposed by Defendants.  Plaintiffs also suggest that the
      Court could declare the statute unconstitutional, order the parties to "come up with a plan"

28    for an election process, and "talk that out in advance" so that Plaintiffs could determine if
      the plan was acceptable to them.  (Doc. 61 at 45).

mandating the timeline proposed by Plaintiffs.  Plaintiffs have not identified that they possess a right to vote any time there is a vacancy in representation.  Moreover, Plaintiffs do not provide any authority for their argument that any delay over a year is "presumptively suspect," or for their argument that the interim appointment can only be "reasonable and brief."  (Doc. 13 at 6).  The "one year" rule proposed by Plaintiffs is arbitrary, as admitted by Plaintiffs' counsel when he stated that it would not be "a bright-line rule," and is not based in the law.  (Doc. 61).  The Seventeenth Amendment, in conjunction with the Elections Clause, leaves the authority to the states to establish the vacancy procedures and the State of Arizona has done so here.

Because Senator McCain died just days before the scheduled 2018 primary election, over two years will pass before the voters have a chance to fill the seat by election.  While this period may not be a short period of time, nothing in the Seventeenth Amendment limits the period of time an appointed senator can be in office.  The 27-month period, on its own, is not unreasonable considering case precedent, and does not amount to an unreasonable restriction on Plaintiffs' right to vote.[15]  Because there is no unreasonable restriction on Plaintiffs' right to vote, Plaintiffs cannot establish a violation of their Constitutional rights and therefore, Count One will be dismissed.

### C.    Interpretation of the Appointment Power

Plaintiffs argue in Count II of the FAC that Section 16-222 violates the text of the Seventeenth Amendment that the "legislature of any state *may empower* the executive thereof to make temporary appointments . . . ."  U.S. CONST. amend. XVII (emphasis added).  Plaintiffs argue that Section 16-222 *requires* the governor to appoint a person to fill the vacancy, rather than *empowering* him to do so, and therefore that the Statute violates the Seventeenth Amendment and their right to be represented by an *elected* senator.  Defendants argue that the text of the Amendment allows the legislatures to choose whether

---

[15] Plaintiffs argue that applicable case law does not address the question of whether the Seventeenth Amendment's phrase 'as the legislature may direct' gives the states "unlimited power to delay or suspend a vacancy election."  (Doc. 35 at 9).  Neither will the Court address that question; Section 16-222 clearly does not suspend the vacancy election forever, it is just not as soon as Plaintiffs want it to be.

1    to empower the governor to make a temporary appointment, or to require a special election

2    without allowing an interim appointment.

3        A similar argument was unsuccessfully made by the plaintiffs in *Judge*, and the

4    Seventh Circuit refused "to read a limitation into the Seventeenth Amendment that is not

5    there." *Judge*, 612 F.3d at 550.  The plaintiffs in *Judge* (represented by the same law firm

6    as is in this lawsuit) argued that Illinois's appointment statute was "unconstitutional

7    because it usurps the governor's duty to call a special election . . . and compels (rather than

8    'empowers') the governor to make a temporary appointment in the interim."  *Judge v.*

9    *Quinn*, 623 F. Supp. 2d 933, 936 (N.D. Ill. 2009), *aff'd*, 612 F.3d 537 (7th Cir. 2010),

10   opinion amended on denial of reh'g, 387 F. App'x 629 (7th Cir. 2010).  Furthermore,

11   Plaintiffs do not explain their argument, nor cite to any legal authority, that the Statute

12   "impermissibly dictates an electoral outcome," or their contention that the Governor's

13   appointment lacks "legitimacy" and prevents them from having "a direct relationship with

14   their representatives in Congress."  (Doc. 15 at 11-13).  Plaintiffs have not established that

15   Section 16-222 infringes on their right to have direct representation in the Senate, or that it

16   dictates electoral outcomes or disfavors a class of candidates.[16]  *See U.S. Term Limits v.*

17   *Thornton,* 514 U.S. 779, 833-34 (1995).

18       Plaintiffs are asking this Court to interpret the Seventeenth Amendment as never

19   done before in its 100-year history, by holding that the text requires the states to give power

20   to the governor to choose whether to appoint someone to the vacancy, or to hold a special

21   election without making a vacancy appointment.  The Seventeenth Amendment, and the

22   cases that have interpreted it, leaves the decision to the state legislatures.  The Arizona

23   Legislature has spoken on the matter and has done so in a constitutionally permissible way.

24   Accordingly, Plaintiffs have not stated a claim in Count Two on which relief can be

---

25

26   [16] Likewise, the cases on which Plaintiffs rely are not relevant to the issue at hand.  *See*
     *U.S. Term Limits v. Thornton,* 514 U.S. 779, 833-34 (1995) (striking down Arkansas law

27   that imposed term limits on members of congress and holding that the states have the
     "authority to issue procedural regulations, and not . . . to dictate electoral outcomes, or to
     favor or disfavor a class of candidates").  Plaintiffs cannot establish that the Section 16-

28   222 does any of the above.  Moreover, Section 16-222 does not regulate any person running
     for *election* or alter any of the qualifications for standing for an *election*.

1    granted.

2    ### D.    "Same political party" Requirement

3        In Count Three, Plaintiffs argue that Section 16-222's "same political party"

4    requirement violates the Elections Clause, the Qualifications Clause, and the Seventeenth

5    Amendment.  Defendants argue that Plaintiffs do not have standing to pursue this claim.

6    ### 1.    Legal Standards

7        Article III provides that federal courts may only exercise judicial power in the

8    context of "cases" and "controversies."  U.S. CONST. art. III, § 2, cl. 1; *Lujan v. Defs. of*

9    *Wildlife*, 504 U.S. 555, 559 (1992).  For there to be a case or controversy, the plaintiff must

10   have standing to sue.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("*Spokeo II*").

11   Whether a plaintiff has standing presents a "threshold question in every federal case

12   [because it determines] the power of the court to entertain the suit."  *Warth v. Seldin*, 422

13   U.S. 490, 498 (1975).  A suit brought by a plaintiff without Article III standing is not a

14   "case or controversy," and an Article III federal court therefore lacks subject matter

15   jurisdiction over the suit.  *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 101

16   (1998).  In that event, the case must be dismissed pursuant to Rule 12(b)(1).  *Id.*

17       To establish standing, a plaintiff seeking the jurisdiction of a federal court has the

18   burden of clearly demonstrating that she has: "(1) suffered an injury in fact, (2) that is fairly

19   traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed

20   by a favorable judicial decision."  *Spokeo II*, 136 S. Ct. at 1547 (quoting *Warth*, 422 U.S.,

21   at 518); *accord Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)

22   (noting the party asserting jurisdiction bears the burden of establishing subject matter

23   jurisdiction).  A plaintiffs' alleged "personal stake in the outcome" of the case must be

24   distinct from a "generally available grievance about government."  *Lance v. Coffman,* 549

25   U.S. 437, 439 (2007) (*per curiam*).  "That threshold requirement 'ensures that we act as

26   judges, and do not engage in policymaking properly left to elected representatives.'"  *Gill*

27   *v. Whitford*, 138 S. Ct. 1916, 1923 (2018), quoting *Hollingsworth v. Perry,* 570 U.S. 693,

28   700 (2013).

1        A plaintiff must prove standing "in the same way as any other matter on which the

2  plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required

3  at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Ordinarily, "'[f]or

4  purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing

5  courts must accept as true all material allegations of the complaint and must construe the

6  complaint in favor of the complaining party.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1068

7  (9th Cir. 2011) (quoting *Warth*, 422 U.S. at 501). Here, however, Plaintiffs are also moving

8  for a preliminary injunction, and as such, they must make "a clear showing of each element

9  of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013); s*ee also Lopez,* 630

10  F.3d at 785 ("[A]t the preliminary injunction stage, a plaintiff must make a 'clear showing'

11  of his injury in fact") (internal citation omitted).

12              **2.**      **Analysis**

13        Plaintiffs argue that a condition of Senator McSally's service is that she "remain a

14  member of the Republican party," adding an additional qualification for service in the

15  Senate. (Doc. 13 at 5). Moreover, Plaintiffs argue that, as a result of the partisan

16  requirement, the "Governor has deprived the plaintiffs their right under the First

17  Amendment to be free from official endorsement by the State of Arizona of the particular

18  viewpoint that they will hear and receive from unelected persons serving in the Senate."

19  (*Id.* at 8-9).

20        Defendants argue that, pursuant to the Seventeenth Amendment and Section 16-

21  222, the authority to appoint a temporary replacement to the Senate belongs solely to the

22  governor. Thus, they argue that only Governor Ducey is restricted by Section 16-222; and,

23  therefore, that only he has standing to challenge Section 16-222 on that ground.

24  Nonetheless, Defendants argue that even if Plaintiffs could establish standing, the partisan

25  requirement protects the rights of the voters and is constitutional.

26        As Plaintiffs seek injunctive relief, the initial inquiry for the Court must be whether

27  Plaintiffs' FAC makes a "clear showing" of each element of standing. *Spokeo II,* 136 S.

28  Ct. at 1547; *Lopez,* 630 F.3d at 785. Here, the FAC alleges harm that is speculative at best.

Plaintiffs' alleged harm apparently stems from the possibility that they would receive better representation by a person of a different political party. Initially, the Court finds this is not a "clear showing" of an injury in fact. Plaintiffs also cannot clearly establish a redressable injury. The effect of what they seek, declaring this provision to be unconstitutional, would be that Governor Ducey's appointment would not necessarily have to be a Republican. Plaintiffs have not argued, nor could they establish, that, even if the same party requirement was held unconstitutional, Governor Ducey would not just keep Sen. McSally in place. Even if there was harm here, there is not redressability, as the Court cannot order the Governor to appoint a replacement that is suitable to plaintiffs. While it is not exactly clear to the Court who has been alleged to have suffered an injury here, Plaintiffs have not established particularized harm fairly traceable to Defendants, nor have they established a redressable injury. Plaintiff Hess argues that he would have liked to have been considered for the open Senate seat, but as a registered Libertarian he was not able to be considered and thus was harmed. Notably, he does not argue that his chances would be any different had this provision not existed. Hess has not made a "clear showing" of an injury in fact.[17] *See Lopez,* 630 F.3d at 785. Rather, it appears that Plaintiffs have a concern that could be addressed through the political process. *See Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018), quoting *Hollingsworth v. Perry,* 570 U.S. 693, 700 (2013) (The Court should "not engage in policymaking properly left to elected representatives").

Plaintiffs did not establish an injury in fact and redressability for purposes of standing and thus the Court will not reach the merits of Plaintiffs' argument in Count Three.[18]   Plaintiffs lack particularized harm and a redressable injury, and therefore

---

[17] Even if there was harm here, there is not redressability, as the Court cannot Order the Governor to appoint Hess to the vacant Senate seat, nor can the Court require the Governor to consider Mr. Hess or any other individual. Moreover, Hess argues that he plans to run for the Senate in the future and will be "prejudiced by the effective incumbent advantage" of Sen. McSally. While he did not produce evidence of this "advantage," re-election rates for appointed senators is approximately 52%, substantially lower than the incumbency advantage that non-appointed senators enjoy. https://www.senate.gov/artandhistory/history/common/briefing/senators_appointed.htm.

[18] Had Plaintiffs established standing, the Court notes that the Supreme Court has upheld similar politically-oriented schemes to be constitutional. *See Rodriguez*, 457 U.S. at 12. Nonetheless, the Court need not reach the issue here.

1    Plaintiffs lack Article III Standing and Count Three of the FAC will be dismissed.

2    **V.    Injunctive Relief**

3           Because of the Court's ruling herein, the Court will only briefly examine the factors
4    for injunctive relief.[19]   A preliminary injunction "is an extraordinary and drastic remedy,
5    one that should not be granted unless the movant, by a clear showing, carries the burden of
6    persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A
7    C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, 129–130 (2d ed.
8    1995)).  An injunction may be granted when the movant shows that "'he is likely to succeed
9    on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,
10   that the balance of equities tips in his favor, and that an injunction is in the public interest.'"
11   *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)
12   (quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)).  In this circuit,
13   a preliminary injunction may also be issued when a plaintiff shows that "'serious questions
14   going to the merits were raised and the balance of hardships tips sharply in [plaintiff's]
15   favor.'"  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)
16   (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)).  The movant has
17   the burden of proof on each element of the test.  *Envtl. Council of Sacramento v. Slater*,
18   184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

19          Where relief seeks to order "a responsible party to take action," it is properly
20   "treated as a mandatory injunction."  *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir.
21   2015).  A mandatory injunction "goes well beyond simply maintaining the status quo
22   pendente lite [and] is particularly disfavored." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313,
23   1320 (9th Cir. 1994) (internal citations omitted).  A "district court should deny such relief
24   unless the facts and law clearly favor the moving party."  *Id*. (quoting *Anderson v. United
25   States*, 612 F.2d 1112, 1114 (9th Cir. 1979)).

26          Section 16-222 imposes reasonable and nondiscriminatory restrictions on the
27   Plaintiffs' First and Fourteenth Amendment rights to vote, and the regulatory interests of

28   _____

[19] The Court notes that Plaintiffs devote less than one page of their 18-page brief in support of their Motion for Preliminary and Permanent Injunction to the *Winter* analysis.

the State are sufficient to justify the limited restrictions, if any, caused to Plaintiffs.  *See Burdick*, 504 U.S. at 433 (1992).  Plaintiffs have not shown that any of their Constitutional rights have been violated by the effects of Section 16-222.  Moreover, Plaintiffs do not have standing to challenge the same party requirement of Section 16-222.  Therefore, Plaintiffs cannot show that they are likely to succeed on the merits of their claims.  Plaintiffs cannot establish a likelihood of irreparable harm absent the protection of a preliminary injunction.  Generally, courts of equity should not act when the moving party "will not suffer irreparable injury if denied equitable relief." *Younger v. Harris*, 401 U.S. 37, 43–44 (1971).  Plaintiffs have the burden of establishing that there is a likelihood, which is more than just a possibility, that they will suffer irreparable harm if a preliminary injunction is not entered.  *See Winter*, 555 U.S. at 21–23.  Plaintiffs have not established irreparable harm here.

Moreover, the Court finds the balance of equities and public interest weigh in favor of Defendants.  Plaintiffs have not been denied a right to vote, neither has their right to vote in an election been delayed.  The costs to the state, as outlined herein, are high and negatively impact Plaintiffs and all Arizona taxpayers.  Moreover, Plaintiffs recognize the "expense of a special election" to the citizens of Arizona.  (Doc. 15 at 18).  As Plaintiffs have not met their burden of proof on any of the *Winter* elements, Plaintiffs' Motion for injunctive relief will be denied.

**VI.  Conclusion**

"In this case we are confronted with no fundamental imperfection in the functioning of democracy.  No political party or portion of the state's citizens can claim it is permanently disadvantaged . . . or that it lacks effective means of securing legislative reform if the statute is regarded as unsatisfactory.  We have, rather, only the unusual, temporary, and unfortunate combination of a tragic event and a reasonable statutory scheme." *Valenti*, 292 F. Supp. at 867.  The same is true here.  Section 16-222 does not violate Plaintiffs' First or Fourteenth Amendment rights to vote in the direct election of their senator, nor is Section 16-222 unconstitutional under the framework of the

Seventeenth Amendment.  The Seventeenth Amendment, along with the Elections Clause, allocates a duty to the states to establish the time, place, and procedures for special elections in the event of a vacancy in the Senate.  The Amendment does not impose a temporal limit on the vacancy period, and certainly does not mandate an election be held "within one year" of the vacancy.  Moreover, the State's interests in avoiding excessive costs, lessening voter confusion, and increasing voter turnout are substantial interests that result in reasonable and non-severe restrictions (if any) on Plaintiffs' rights to vote.  Therefore, Section 16-222 is constitutional, and the Court will not substitute its own judgment for that of the legislature.  *See Valenti*, 292 F. Supp. at 867 ("[A]s the Seventeenth Amendment has specifically given to the legislatures of the states power to regulate vacancy elections, it is not for a federal court to substitute its own judgment for that of the elected representatives of the people.").  Accordingly, Defendants' Motion to Dismiss will be granted[20] and Plaintiffs' Motions denied as moot.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (Doc. 21) is **granted**.  Counts One and Two are dismissed for failure to state a claim upon which relief can be granted.  Count Three is dismissed because Plaintiffs lack standing to assert the claim.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary and Permanent Injunction (Doc. 14) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Consolidate a hearing on the Motion for Preliminary and Permanent Injunction with Trial on the Merits (Doc. 16) is **denied as moot**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Status Conference (Doc. 65) is **denied as moot**.

…

---

[20] Because the parties agree that all facts have been pled, all evidence has been submitted, and the matters before the Court are purely legal in nature, the Court finds that the pleadings could not be cured with the allegation of additional facts.  Thus, amendment would be futile, and this action shall be terminated.

1    **IT IS FINALLY ORDERED** that the Clerk of Court shall kindly enter judgment

2    and terminate this action.

3         Dated this 27th day of June, 2019.

4

5

6    _____
     Honorable Diane J. Humetewa
7    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28